**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BEMCY, LLP,**<br>　　　　　　**Plaintiff,**<br><br>　　　　v.<br><br>**GILEAD SCIENCES, INC.,**<br>　　　　　　**Defendant.** | **CIVIL ACTION**<br><br><br><br>**NO.  21-3734** |

## <u>MEMORANDUM OPINION</u>

Defendant Gilead Sciences, Inc. ("Gilead") contracted to pay Plaintiff BEMCY LLP ("Bemcy") $2 million to be the primary sponsor of an eight-episode educational documentary series with the working title "40 Years of HIV" to be produced by Bemcy (hereinafter the "Program").  Four months after signing the agreement, Gilead terminated it having paid nothing of the sponsorship fee.  Bemcy sued for breach of contract and fraud in the inducement.  Gilead has moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## I.    BACKGROUND[1]

Bemcy and Gilead occupy different sectors of the health care industry:  Bemcy creates educational videos about life sciences and health care, while Gilead develops prescription medicines that are used to treat HIV.  At the outset of contract negotiations, Gilead retained Initiative Media, LLC ("Initiative") to act as its agent in the deal.

The agreement reached on or about April 8, 2021 (the "Agreement") provided that, for a $2 million sponsorship fee, Gilead was to be the primary sponsor of the Program.  Of central importance here is Section 2 and Schedule B of the Agreement.  Section 2 provides that:

---

[1] The following facts are taken from the Amended Complaint and the appended exhibit.  They are assumed to be true for purposes of this Motion to Dismiss.  *See, e.g.*, *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

"Producer shall invoice the Agency for such Sponsorship Fees in accordance with the schedule set forth on Schedule B and Agency, on behalf of the Company, shall pay the amounts set forth in such invoice(s) within sixty (60) days of receipt via wire transfer according to instructions provided to Agency by Producer."  Under the Agreement, Bemcy is defined as the Producer, Initiative is the Agency, and Gilead is the Company.  The timeline for payment is set forth in Schedule B, which provides:  "BEMCY shall invoice Two Million Dollars ($2,000,000 USD) upon the full execution of this Agreement.  Agency on behalf of Company shall pay BEMCY within []60 days of receipt of invoice via wiring instructions provided with the invoice."

On April 30, 2021, Bemcy invoiced Initiative for the sponsorship fee.  It contends that Gilead breached the Agreement when it did not pay the full $2 million amount by June 29, 2021 at the latest (the Agreement having been executed in full and, thus, in accordance with Section 2 and Schedule B, the amount being payable within 60 days of its invoice).[2]  Things seemed to be going along swimmingly:  before the payment was due, Gilead and Initiative made repeated representations to Bemcy that the fee would be paid in a timely manner.  Indeed, Gilead transferred the $2 million to Initiative.  But, Initiative did not forward the money to Bemcy.  Rather, Gilead attempted to re-negotiate the terms of payment such that the $2 million was paid in incremental amounts over a period of time rather than in a lump sum.

Over a month after the payment was due, Gilead terminated the Agreement.  It purportedly did so pursuant to a provision in the Agreement which gives Gilead the right to "terminate this Agreement, without cause, at any time by providing Producer with thirty (30) days' prior written notice."  In the event of a termination, the Agreement entitles Bemcy to "any

---

[2] While waiting for Gilead's payment, Bemcy took steps to produce the program and claims to have incurred substantial costs in doing so.

undisputed actual costs and expenses incurred as of the date of termination" but requires it to refund any "unused portion of the pre-paid Sponsorship Fee."

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed if it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To decide a motion to dismiss, courts may consider: (1) the allegations contained in the complaint; and, (2) exhibits attached to the complaint, here, the Agreement. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (internal citations and quotation marks omitted). In evaluating a motion to dismiss, all factual allegations of the complaint are accepted as true and are construed in the light most favorable to the plaintiff. The question is then "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Blanyar v. Genova Prods. Inc.*, 861 F.3d 426, 431 (3d Cir. 2017) (internal quotation marks and citations omitted). A complaint will survive a motion to dismiss only if it "contains sufficient factual matter" which, if accepted as true, states "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## III.   DISCUSSION

### a.   Bemcy's Breach of Contract Claim

To state a claim for breach of contract under Pennsylvania law, a plaintiff must plead: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and, (3) resultant damages. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003). The Amended Complaint satisfies all three requirements. Its allegations are that there is a written contract between the parties (which is attached to the Amended Complaint); that by the terms of this contract, Defendant was obligated to remit the entirety of the $2 million

3

sponsorship fee within 60 days of receiving an invoice requesting payment from Bemcy, *i.e.*, by June 29, 2021; and, that despite this payment obligation, Defendant did not pay Bemcy the sponsorship fee by this deadline.  Accordingly, Gilead was in breach of the Agreement after June 29, 2021.  Bemcy avers that Gilead's breach caused it to sustain damages in an amount which exceeds the $2 million sponsorship fee.

Nonetheless, Gilead argues that Bemcy has failed to plead a breach of contract claim because Gilead had the right to back out of its contractual obligations at any time for any reason pursuant to the Agreement's "termination for convenience" provision which provides, in relevant part, that "Company may terminate this Agreement, for its convenience, without cause, at any time by providing Producer with thirty (30) days written notice."[3]

Termination for convenience provisions are somewhat unusual terms.  These clauses first appeared in government contracts during World War I, though their roots go as far back as the civil war.  *Linan Faye Const. Co., Inc. v. Housing Auth. of City of Camden*, 49 F.3d 915, 923 (3d Cir. 1995); *Torncello v. United States*, 681 F.2d 756, 764-65 (Ct. Cl. 1982).  These provisions emerged as a means for the government to "avoid the continuance of contracts that the rapid changes of war, or the war's end, had made useless or senseless."  *Id.* at 763.  Termination for convenience clauses were therefore designed to allow the government to halt the performance of

---

[3] Gilead's argument regarding the termination for convenience clause is technically an affirmative defense, which the Federal Rules of Civil Procedure require be raised in an answer, not in a motion to dismiss.  Nonetheless, in this Circuit an affirmative defense may be raised in a motion to dismiss where the defense is "apparent on the face of the complaint."  *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005).  "The face of the complaint" has, in turn, been interpreted to go beyond the allegations in the complaint and extend to "materials embraced by the complaint, and materials attached to the complaint."  *Hoffman v. Nordic Naturals, Inc.*, 837 F.3d 272, 280 n.52 (3d Cir. 2016) (internal citations and quotations omitted); *Schmidt*, 770 F.3d at 249.  The burden of establishing the applicability of an affirmative defense to a particular claim rests with the defendant.  *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 292 (3d Cir. 2010) (quoting *Bradford-White Corp. v. Ernst & Whinney*, 872 F.3d 1153, 1161 (3d Cir. 1989)).  Here, the "termination for convenience clause" defense is apparent from the "face of the complaint" as it is alluded to by Bemcy's allegations that Gilead breached the Agreement by "purporting to terminate it without cause" and "in bad faith" and the clause itself is apparent from the appended copy of the Agreement.

the contract without being in breach of its terms, and thereby allocate the risk of an early termination of a contract between the government and a contractor in the event full performance was no longer needed.  *Id.*; *Van Engers v. Perini Corp.*, 1993 WL 235911, at *7 (E.D. Pa. June 28, 1993).  Contractors thus knew that they could lose the benefits of full performance, but only when the exigencies of war so demanded.  *Torncello*, 681 F.2d at 765.

In the 1950-60s, termination for convenience clauses began to appear widely in government contracts, including non-military procurement contracts executed during peacetime. *Id.* at 765-66.  As war no longer justified the government's at-will termination of its contracts, courts imposed limits on how and why termination for convenience clauses could be exercised. Otherwise, the government would have unbounded discretion to enter and exit contracts at its whim, which raised concerns that its contracts were illusory.  *Linan-Faye Const. Co., Inc.*, 49 F.3d at 924.

This concern stemmed from the requirement that both parties furnish consideration for their contractual promises.  A "route of complete escape", like that provided by a termination for convenience clause, would "vitiate any other consideration furnished" and therefore be incompatible with the existence of a valid contract.  *Torncello*, 681 F. 2d at 769.  In short, any promises that the government had the unfettered right to break a contract were not actually promising anything at all.  *Id.*; *Van Engers v. Perini Corp.*, 1993 WL 235911, at *7 ("The central tenant of all 'termination for convenience' clause cases is that the contract cannot be illusory."). Therefore, the government's exercise of termination for convenience clauses in times of peace are limited to "situations where the circumstances of the bargain or the expectations of the parties have changed sufficiently that the clause serves only to allocate risk."  *Torncello*, 681 F.2d at 771.  Accordingly, the government cannot use a "termination for convenience clause to

dishonor, with impunity, its contractual obligations[,]" *id.* at 772, nor can it avoid a claim for breach when it "contracts with a party knowing full well that it will not honor the contract," *Linan-Faye Const. Co., Inc.*, 49 F.3d at 925, or when it otherwise acted in bad faith or abused its discretion. *Id.* Should the government nonetheless choose to terminate an agreement on these grounds, its termination will be treated as a breach. *Torncello*, 681 F.2d at 772.

Eventually, termination for convenience clauses made their way into the private sector. The body of federal common law interpreting termination for convenience provisions does not necessarily govern the interpretation of these provisions in private contracts because state law, not federal common law, presumptively applies to contract disputes between private parties. *Linan-Faye Const. Co., Inc.*, 49 F.3d at 919 (stating that federal courts presumptively apply state law where jurisdiction is based on diversity of citizenship). If the appropriate state's jurisprudence has little precedent directly on point, however, courts may then turn to federal common law for guidance. *Id.* at 921-22.

In this case, the Parties agree that Pennsylvania law applies. They disagree, however, as to whether Pennsylvania contract law imposes any limits on the use of termination for convenience clauses. Defendant cites a half-dozen cases which it reads as holding that termination for convenience provisions give a contracting party the absolute right to cancel an agreement and that the party's motivations or good faith in doing so are wholly irrelevant. Of these cases, only a non-binding opinion, *Temp-Way Corp. v. Cont'l Bank*, 139 B.R. 299 (E.D. Pa. 1992), *aff'd mem.*, 981 F.2d 1248 (3d Cir. 1992), even applies Pennsylvania law; the remainder of Defendant's cases apply law from outside this Circuit or that of other states.[4] But even then,

---

[4] *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 856 F. Supp. 990, 1007 (E.D. Pa. 1994) (applying Maryland contract law); *Kassin v. CompuCom, Inc.*, 2012 WL 893097, at *2 (D.N.J. Mar. 5, 2012) (applying Virginia contract law); *Blanos v. Penn Mut. Life Ins. Co.*, 2010 WL 143670, at *7 (D.N.J. Jan. 12, 2010) (applying New Jersey contract law); *Cook v. Gen. Nutrition Corp.*, 2017 WL 4340664, at *7 (W.D.Pa. Sept. 29, 2017), *aff'd*, 749 Fed. App'x 126

Defendant misreads *Temp-Way* for a proposition far broader than it actually holds.  In *Temp-Way*, a post-trial decision regarding loan agreements between a bank and a bankrupt corporation, the reviewing court held that Pennsylvania law treated lender-borrower relationships differently than other contracts, and did not impose an obligation of good faith on a lender's decision to "terminate or not renew" its loan commitment when the contract gave the lender the right to do so.  139 B.R. at 319-20.  In support of this holding, the *Temp-Way* court cited to two decisions by the Pennsylvania Supreme Court which permitted petroleum companies to terminate their franchise agreements at the *end* of the lease term when the contract contained a clear provision allowing them to do so.  *See id.* at 320 (citing *Amoco Oil Co. v. Burns*, 437 A.2d 381, 384 (Pa. 1981) (holding that there was no obligation of good faith when the lease agreement contained a "clear and unambiguous provision permitting termination by either party without cause on proper notice *at the end* of the original or renewal term.") (emphasis added)) and *Witmer v. Exxon Corp.*, 434 A.2d 1222, 1227 (Pa. 1981) (holding that the duty of good faith did not define the franchisor's power to terminate the franchise agreement where the contract "expressly reserve[d] to each party the right not to renew the lease agreement *at the end of the lease term*." (emphasis added)).  These two cases say nothing about Pennsylvania's stance on termination for convenience provisions, or whether Pennsylvania condones or imposes limitations on a party's mid-performance termination of a contract.

Although a handful of Pennsylvania cases mention termination for convenience clauses, no case analyzes them in any depth or construes the circumstances under which they may be exercised.  In the absence of Pennsylvania case law that specifically interprets "termination

---

(3d Cir. 2018) (relying upon federal decisions that applied New Jersey, New York, and Texas contract law, or interpreted the Employment Retirement Income Security Act of 1974); *Zaidan Corp v. Borg-Warner Corp.*, 228 F. Supp. 669, 670-71 (E.D. Pa. 1964) (applying case law from the Second and Sixth Circuits).

convenience" clauses, Pennsylvania courts often consult the robust body of federal case law to determine the scope and effect of such clauses. *See, e.g.*, *Okeke-Henry v. Southwest Airlines, Co.*, 163 A.3d 1014, 1017 n.4 (Pa. Super. 2017) (noting that Pennsylvania courts treat decisions of lower federal courts as persuasive); *Werner v. Plater-Zyberk*, 799 A.2d 776, 782 (Pa. Super. 2002) ("Whenever possible, Pennsylvania state courts follow the Third Circuit so that litigants do not improperly 'walk across the street' to achieve a different result in federal court than would be obtained in state court. . . .  [I]f the Third Circuit has not ruled on a specific question, [Pennsylvania courts] may seek guidance from the pronouncements of the other federal circuits, as well as the district courts, in the same spirit in which the Third Circuit itself considers such decisions." (internal citations omitted)); *Linan-Faye Const. Co., Inc.*, 49 F.3d at 922 (holding that New Jersey courts would look to "the rich body of federal common law concerning the termination for convenience doctrine, unless to do so would violate some enshrined principle of New Jersey.").

Pursuant to federal common law, a party cannot exercise a termination for convenience clause in bad faith; it is obligated to act in good faith. *See, e.g.*, *Linan-Faye Const. Co., Inc.*, 49 F.3d at 924-25 ("[T]he Government [can] invoke the [termination for convenience] clause so long as it did not act in bad faith or clearly abuse its discretion." (internal citations and quotation marks omitted)); *Torncello*, 681 F.2d at 45.  A holding to the contrary would render the contract illusory. *Torncello*, 681 F.2d at 48 ("It is nothing more than basic contract law that a power to terminate must be limited in some meaningful way, as measured by the requirement of consideration. . . .  Any contract containing the clause, in the absence of something else to furnish consideration, would fail for the lack of any binding obligation.").  Pennsylvania law interprets contracts consistently with these limitations; it too imposes obligations of good faith

and considers "entirely optional" promises to be illusory.  *See, e.g.*, *J.J. DeLuca Co., Inc. v. Toll Naval Assocs.*, 56 A.3d 402, 412 (Pa. Super. 2012) ("Every contract imposes a duty of good faith and fair dealing on the parties in the performance and the enforcement of the contract." (internal citation omitted)); *Geisinger Clinic v. Di Cuccio*, 606 A.2d 509, 512 (Pa. Super. 1992) ("If the promise is entirely optional with the promisor, it is said to be illusory and, therefore, lacking consideration and unenforceable.").

Here, Bemcy has pled that Gilead did not terminate the agreement in good faith because Gilead was in breach when it exercised its right under the clause.  Whether Gilead acted in bad faith and whether, as a result, it owes Bemcy all or some portion of the sponsorship fee as damages are questions of fact that cannot be determined at this preliminary stage.[5]  Accordingly, Gilead's motion to dismiss Bemcy's breach of contract claim shall be denied.

### b.  Bemcy's Fraud Claim

Bemcy also claims that Gilead committed fraud in the inducement because it falsely represented to Bemcy that it would pay the full amount of the sponsorship fee by the deadline when it had no intention to do so.  Gilead moves to dismiss this claim because the Amended Complaint is not pled with sufficient factual detail.[6]

---

[5] Defendant questions the existence of subject matter jurisdiction on the grounds that, in this diversity case, Plaintiff has not alleged that its damages exceed $75,000, the amount in controversy required by 28 U.S.C. § 1332. Specifically, Defendant argues that the termination for convenience provision does not entitle Plaintiff to the entire $2 million sponsorship fee.  Rather, Defendant argues that the provision limits Plaintiff to its "undisputed actual costs and expenses."  It further argues that Plaintiff is not entitled to recover attorneys' fees and is expressly barred from recovering consequential damages, specifically lost opportunity costs and lost profits, under the Agreement. As the Amended Complaint does not specify the costs and expenses Plaintiff incurred in producing the program, Defendant reasons that Plaintiff has not shown that its damages exceed $75,000.  At the motion to dismiss stage, however, the amount claimed in the plaintiff's complaint is controlling and is deemed to be the entire amount in controversy.  *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289-92 (1938); *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 353 (1961) (holding that the amount in controversy must be determined from an examination of the complaint at the time filed).

[6] Gilead also argues that the claim is barred by the "gist of the action", a Pennsylvania doctrine which "forecloses a party's pursuit of a tort action for the mere breach of contractual duties without any separate or independent event giving rise to the tort."  *Sköld v. Galderma Labs., L.P.*, 99 F. Supp. 3d 585, 600 (E.D. Pa. 2015) (internal citations

Rule 9(b) of the Federal Rules of Civil Procedure provides the pleading standard for fraud claims.  It requires a party to "state *with particularity* the circumstances constituting fraud or mistake."  Fed R. Civ. P. 9(b) (emphasis added).  The Third Circuit has interpreted this higher standard as "stringent" and requires a plaintiff to allege the "date, time and place of the alleged fraud or otherwise inject precision or some measures of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200.  Pennsylvania law further requires that a plaintiff bringing a claim for fraud in the inducement allege: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 257 (3d Cir. 2013).  Fraudulent inducement refers only to those misrepresentations made to convince a party to enter into a contract; it does not apply to those made after a contract is executed.  *See In re Allegheny Intern.*, 954 F.2d 167, 178 (3d Cir. 1992) ("Under Pennsylvania law, inducing another to enter into a contract by means of fraud or a material misrepresentation, when the other party was under no duty to enter into the contract, is a key element of a claim for fraudulent inducement.").

Bemcy's fraud allegations are so thin that it is difficult to determine the basis of its claims.  Although in its opposition brief, Bemcy contends that Gilead made fraudulent representations "when [it] signed the Agreement, and later in May and June 2021," its Amended Complaint makes no reference to any representations made before or at the time of the execution

---

and quotation marks omitted).  A claim is barred by the gist of the action doctrine "[i]f the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract. . . ." *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014).  Because Bemcy has not sufficiently pled a fraud claim, consideration of whether the gist of the action doctrine would preclude such a claim is premature.

of the Agreement.  The Federal Rules require that pleadings "provide enough information to put a defendant on sufficient notice to prepare their defense and also ensure that the Court is sufficiently informed to determine the issue." *Fabian v. St. Mary's Med. Ctr.*, 2017 WL 3494219, at *3 (E.D. Pa. Aug. 11, 2017) (internal citations and quotations omitted).  Gilead cannot be expected to respond to Bemcy's fraudulent inducement claim when it is wholly unclear what facts it is based on.  Accordingly, Bemcy's fraudulent inducement claim regarding Gilead's statements when it signed the Agreement shall be dismissed, but Bemcy will be afforded leave to amend and allege further factual detail to make out its claim.

To the extent that Bemcy's fraudulent inducement claims are premised on acts or statements made after the signing of the Agreement  they could not have convinced Bemcy to enter into it and, accordingly, will be dismissed with prejudice.[7]

An appropriate order follows.

**BY THE COURT:**

*/s/ Wendy Beetlestone*

**WENDY BEETLESTONE, J.**

---

[7] On a motion to dismiss, a complaint may be dismissed with prejudice and plaintiff may be denied leave to further amend his claims if amendment would be inequitable or futile.  *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).  Simply stated, a court may dismiss a claim with prejudice if an amendment would still not cure the deficiency.  *Id.*