IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BEMCY, LLP,**<br>            **Plaintiff,** | **CIVIL ACTION** |
| v. | |
| **GILEAD SCIENCES, INC.,**<br>            **Defendant.** | **NO.  21-3734** |

<u>**MEMORANDUM OPINION**</u>

This case primarily concerns whether Defendant Gilead Sciences, Inc. ("Gilead") should pay Plaintiff BEMCY LLP ("Bemcy") $2 million as the primary sponsor of an eight-episode educational documentary series to be produced by Bemcy (hereinafter the "Program").  A contract signed by the parties concerning the Program contained the $2 million Sponsorship Fee but the series was never produced.  Eventually, Gilead terminated the contract but not before, Bemcy contends, it had breached by not paying the Sponsorship Fee in a timely manner.  The parties have cross-moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the one remaining claim for breach of contract.  Gilead also contends that if it does not succeed on summary judgment with respect to its breach, it is entitled to summary judgment on the issues of damages: specifically, it argues Bemcy's damages should be limited to its undisputed costs and expenses.

For the reasons set forth below, summary judgment shall be granted in favor of Bemcy with respect to the breach and the $2 Million Sponsorship Fee.  The question of whether in addition to the Sponsorship Fee Bemcy is entitled to lost profits, costs and expenses is reserved for trial.

**I.      BACKGROUND**

On April 8, 2021 the parties reached an agreement (the "Agreement") whereby Bemcy

1

agreed to produce the Program and Gilead agreed to be the primary sponsor. Gilead retained Initiative Media, LLC ("Initiative") to sign on its behalf and to remit the Sponsorship Fee to Bemcy on Gilead's behalf.

Section 2 and Schedule B of the Agreement spell out the parties' obligations with respect to payment. First, upon execution of the Agreement, Bemcy was to invoice Initiative for the $2 million Sponsorship Fee. Next, within 60 days of receiving the invoice Initiative (on behalf of Gilead) was to pay Bemcy, "via wire transfer according to instructions provided to [Initiative] by [Bemcy]."

Bemcy invoiced Initiative for the Sponsorship Fee on April 30, 2021. Although the invoice did not contain wiring instructions, prior to signing the Agreement, Bemcy had provided Initiative with instructions to send funds to a company called "Y Holdings," one of Bemcy's partners. Although Gilead transferred close to the full amount of the Sponsorship Fee ($1,993,024.69) to Initiative on May 17, 2021, despite repeated representations to Bemcy that the fee would be paid in a timely manner, it was not.

Instead of payment, Gilead sought to amend the Agreement urging, for example, Bemcy to agree to a set of milestones to achieve before receiving any payment. Despite the back and forth, the parties never agreed to nor executed a modification of the Agreement. On August 2, 2021—long after the 60 days following Initiative's receipt of Bemcy's invoice—Gilead provided Bemcy with a "notice of termination." Gilead now argues that it provided the notice pursuant to a termination of convenience clause in the Agreement which gives Gilead the right to "terminate this Agreement, without cause, at any time by providing [Bemcy] with thirty (30) days' prior written notice."

## II.    STANDARD OF REVIEW

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotations omitted); Fed. R. Civ. P. 56. A fact is material where it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And, a genuine issue is present "when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007). The moving party bears the burden of showing the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party "may not merely deny the allegations in the moving party's pleadings; instead, he must show where in the record there exists a genuine dispute over a material fact." *Abington Friends Sch.*, 480 F.3d at 256. In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations and alterations omitted).

### III. DISCUSSION

#### a. Breach of the Agreement

Both parties move for summary judgment on Bemcy's breach of contract claim. Under Pennsylvania law, to prove breach of contract a plaintiff must sufficiently show: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Ware v Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (citing *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. 1999)). Both parties focus on whether there was a breach. Bemcy argues that Gilead breached the Agreement

by failing to pay it the Sponsorship Fee by June 29, 2021, *i.e.* 60 days after Bemcy sent its invoice to Initiative. In response, Gilead argues that it "terminated" the Agreement; thus, in its view, there was no contract to breach.

A party breaches a contract when it fails to do something that it has expressly undertaken to do in an agreement. *Johnson v. Fenestra, Inc. (Erection Division),* 305 F.2d 179 (3d Cir. 1962) (applying Pennsylvania law). In particular, "when performance of a duty under a contract is due, any nonperformance is a breach." *Linde v. Linde*, 210 A.3d 1083, 1091 (2019) (Pa. Super. 2019); *True R.R. Assocs., L.P. v. Ames True Temper, Inc.*, 152 A.3d 324, 339 (Pa. Super. 2016).

Here, Schedule B states that "[Initiative] on behalf of [Gilead] shall pay BEMCY within [] 60 days of receipt of invoice via wiring instructions provided with the invoice." Thus, Gilead's obligation to pay the Sponsorship Fee became due 60 days after Initiative received Bemcy's invoice. Neither party disputes that Bemcy sent an invoice to Initiative for $2 million on April 30, 2021, or that it was received. Nor is it disputed that the Sponsorship Fee was not paid in a timely manner or that it has not since been paid. Further, neither party suggests that the language of Section 2 or Schedule B of the Agreement is in any way ambiguous as to Gilead's duty: to pay Bemcy $2 million 60 days after Bemcy invoiced Initiative. Because Gilead "fail[ed] to do something that it ha[d] expressly . . . undertaken to do" Gilead breached the contract. And its breach—in the form of failure to pay Bemcy—was material, because provision of the Sponsorship Fee "goes to the . . . essence of the contract." *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 650 (Pa. 2009).

Nevertheless, Gilead argues that the Agreement could not have been breached because it was terminated by Gilead pursuant to Section 6.2—a termination for convenience provision—

which provides in relevant part: "[Gilead] may terminate this Agreement, for convenience, without cause, at any time" with thirty days' notice.  Be that as it may, when it sent the "notice of termination" on August 2, 2021, it had already materially breached the Agreement over a month before by not paying the Sponsorship Fee.  And that breach had several effects.  First, it excused any performance on the part of Bemcy, the non-breaching party.  *Linde*, 210 A.3d at 1091.  Second, it effectively "end[ed] [the] contract."  1 Corbin on Pennsylvania Contracts § 6.06 (2021).  And finally, it disabled Gilead from taking advantage of the "termination for convenience" clause, regardless of whether Gilead had given Bemcy proper notice, because "a power of termination typically has a prospective operation, discharging parties from executory duties, but not discharging breaches that have already occurred."  *Id.; see also Sullivan v Charwell Investment Partners, LP*, 873 A.2d 710 (Pa. Super. 2005).  Put simply, the termination for convenience clause was not available to Gilead post its breach for failure to pay.[1]

Gilead also argues that the Agreement should be voided under the doctrine of "unclean hands".  Specifically, it contends that prior to entering the Agreement Bemcy misrepresented its experience and qualifications through pitch materials and budget documents supplied to Gilead.  An agreement may be voided due to "unclean hands" if the defendant demonstrates that the plaintiff "has committed an unconscionable act immediately related to the [relief] the party seeks in . . . the litigation."  *Highmark, Inc. v. UPMC Health Plan, Inc*., 276 F.3d 160, 174 (3d Cir. 2001); *see also Knit With v. Knitting Fever, Inc*., 2009 WL 973492, at *11 (E.D. Pa. 2009) (quoting *Merisant Co. v. McNeil Nutritionals, LLC*, 515 F. Supp.2d 509, 530-31 (E.D. Pa. 2007))

---

[1] Gilead also argues that it "should be relieved of its obligations due to Bemcy's failure of consideration."  But Bemcy did provide consideration in support of the Agreement; it promised that it would produce the Program, just as Gilead promised it would remit the Sponsorship Fee.  *See* 16 Summ. Pa. Jur. 2d Commercial Law § 1:41 (2d ed.) (citing *In re Ratony's Estate*, 277 A.2d 791, 793 (Pa. Super. 1971)) ("Mutual promises afford sufficient legal consideration for the support of each other, and the mutual promises of parties are sufficient to create a binding contract.").

5

(applying Pennsylvania law) (unclean hands applies when "plaintiff's conduct is inequitable and [] involves the subject matter of the plaintiff's claim."). A defendant asserting an unclean hands defense must introduce "clear, convincing evidence of 'egregious' misconduct." *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank*, 383 F.3d 110, 129 (3d Cir.2004). "Egregious misconduct" can take the form of "fraud, unconscionability, or bad faith on the part of the plaintiff." *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 377 n.7 (3d Cir. 1992).

Here, Gilead maintains that Bemcy engaged in "egregious and inequitable conduct" by misrepresenting "the length of time which BEMCY had existed"; "the amount of experience that BEMCY possessed"; as well as "grossly inflat[ing] its budget to justify the $2 million Sponsorship Fee" prior to signing the contract. But as an initial matter, none of these allegations, even if true, "immediately relate[s]" to the subject matter of Bemcy's claim. It is not enough that a "plaintiff ha[d] engaged in some inequitable conduct," *Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F.Supp.2d 594, 610 (D.N.J. 2003); rather, "the nexus between the misconduct and the claim must be close." *Highmark,* 276 F.3d at 174 (citing *In re New Valley Corp.,* 181 F.3d 517, 525 (3d Cir.1999)) (internal quotations omitted).

Here, Bemcy's claim is that Gilead breached the Agreement because Gilead failed to timely pay the Sponsorship Fee. Bemcy's claim has nothing to do with its ability to perform under the contract, or representations either party made during negotiations. Because Gilead's allegations of Bemcy's wrongdoing are unrelated to its timely payment of the Sponsorship Fee, the "close nexus" required under the unclean hands doctrine is not present and the Agreement is not voidable under the doctrine of unclean hands.

Finally, Gilead contends that payment of the Sponsorship Fee was "impossible" because: (1) Bemcy did not have a bank account to which Gilead could wire the Sponsorship Fee; and, (2)

6

Bemcy would not agree to an amendment which would have made the Sponsorship Fee payable to "Y Holdings," the entity Bemcy instructed Initiative to make payment to prior to signing the Agreement.  For support, Gilead points to a host of undisputed facts concerning back and forth between Bemcy and Initiative about who should be paid and how.  For example, the parties do not dispute that prior to signing, Jamie Jones—Bemcy's Director—initially filled out information for "Bemcy" in a Vendor Information Form he provided to Initiative.  Then, on April 6, 2021 (again, prior to signing), Jones filled out an ACH Authorization form identifying the company to be paid as "Y Holdings."  When Jones was informed of this discrepancy by Initiative on April 20, 2021, Jones explained to Initiative that "Y Holdings is . . . the account where the funds would be disbursed" and provided Initiative and Gilead with Tax IDs and IRS forms to facilitate payment.  Gilead then requested that Bemcy endorse an addendum to the Agreement that would modify the payment terms so that the Sponsorship Fee would explicitly be made payable to "Y Holdings."  Bemcy declined to execute the amendment.

        Gilead asserts that Bemcy's failure to agree to the addendum made payment to Bemcy "impossible" and that, "[i]ndeed, it would have been a breach of the contract if Gilead were to pay any entity other than BEMCY."  As a threshold matter, however, Gilead's reading of its obligation under the Agreement is a stretch.  The Agreement simply provides that Gilead (through Initiative) pay Bemcy "according to instructions provided to [Initiative] by [Bemcy]."  Here, those instructions were for Initiative to pay Y Holdings by wire transfer.  That Gilead perceived there to be logistical issues with the transfer, and that it preferred Bemcy agree to certain amendments in the Agreement, does not render its performance of its end of the bargain "impossible."

        b.  **Amount and Type of Damages**

Along with payment of the Sponsorship Fee, Bemcy seeks lost profit damages it claims flow from the breach. Gilead maintains that Section 10 of the Agreement, which is entitled "Limitation of Liability," precludes recovery of lost profits and that the Agreement also limits damages to actual expenses incurred by Bemcy.

As a preliminary matter, limitation of liability clauses are routinely enforced by Pennsylvania courts in contracts between sophisticated parties when the nature of the loss is commercial. *See Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 202-04 (3d Cir. 1995) (collecting cases). Because enforcement of such clauses is important to preserve their purpose of "allocating unknown or undeterminable risks," such limitations are upheld "[s]o long as the limitation which is established is reasonable and not so drastic as to remove the incentive to perform with due care." *Id.* at 204. In other words, limitation of liability clauses are binding absent unconscionability. *See e.g., Conomos, Inc. v. Sun Co., Inc.*, 831 A.2d 696, 704 (Pa. Super. 2003).

Section 10 of the Agreement does preclude loss profits in some circumstances—but not this one. It provides in relevant part:

> LIMITATION OF LIABILITY. **OTHER THAN WITH RESPECT TO . . . [GILEAD'S] PAYMENT OBLIGATIONS CONCERNING THE SPONSORSHIP FEES** . . . NEITHER PARTY WILL BE LIABLE TO THE OTHER FOR: (I) ANY CONSEQUENTIAL,INCIDENTAL, INDIRECT, ECONOMIC, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES . . . AS A RESULT OF ANY ACT, OMISSION, BREACH OR ALLEGED BREACH OF ANY REPRESENTATION, WARRANTY OR OBLIGATION UNDER THIS AGREEMENT OR (II) ANY AMOUNTS GREATER THAN THE FEES PAID OR PAYABLE TO PRODUCER. (emphasis added).

This provision unambiguously does not preclude Bemcy from recovery of consequential, incidental, indirect, and other damages which result from Gilead's "payment obligations concerning the Sponsorship Fees." Meaning Bemcy could potentially recover such damages to

the extent it can show that they stem from Gilead's failure to pay it the Sponsorship Fee. *Am. Eagle*, 584 F.3d at 587 ("Clear contractual terms . . . must be given [full] effect").[2]

Accordingly, Bemcy's summary judgment motion will be granted; Gilead's will be denied; and judgment will be entered in the amount of $2 million in favor of Bemcy with the question of whether Bemcy is entitled to amounts over and above the $2 million reserved for trial.

An appropriate order follows.

BY THE COURT:

/s/ Hon. Wendy Beetlestone

**WENDY BEETLESTONE, J.**

---

[2] Gilead also relies on Sections 6.2 and 1.2 of the Agreement in support of its contention that Bemcy cannot recover the entirety of the Sponsorship Fee as damages. But due to Gilead's breach, neither of these Sections apply. Section 6.2 only applies in the event of "termination," not breach. And because Bemcy was excused from performance of its end of the contract when Gilead breached, the language in Section 1.2 requiring prorated return of the Sponsorship Fee in the event of Bemcy's failure to create certain episodes is also inapplicable.